## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| EUGENE A. MAUWEE, SR., <br><br> Plaintiff, <br><br> v. <br><br> GREG COX, et. al., <br><br> Defendants. | 3:12-cv-00580-RCJ-WGC <br><br> **REPORT & RECOMMENDATION OF U.S. MAGISTRATE JUDGE** |

This Report and Recommendation is made to the Honorable Robert C. Jones, United States District Judge. This action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice (LR) 1B 1-4. Before the court is defendant Valaree Olivas' Motion for Summary Judgment. (Doc. # 20.)[1] Plaintiff filed a response (Doc. # 22) and defendant Olivas filed a reply (Doc. # 23).

After a thorough review, the court recommends that defendant Olivas' motion be granted.

### I. BACKGROUND

At all relevant times, Plaintiff was an inmate in custody of the Nevada Department of Corrections (NDOC). (Pl.'s Compl, Doc. # 4.) The events giving rise to this action took place while Plaintiff was housed at Lovelock Correctional Center. (*Id.*) On screening, Plaintiff was permitted to proceed only with his claim that his rights under the First Amendment's Free Exercise Clause were violated by defendant Olivas on July 25, 2012, when she allegedly harmed and desecrated his Native American religious group's deer antlers, which he contends are an artifact necessary to his religious ceremonies. (Screening Order, Doc. # 3.) Plaintiff alleges that defendant Olivas took the deer antlers from the storage area that held his worship group's religious items, and then claimed the antlers were dropped and broken "and cut them down to

---

[1] Refers to court's docket number.

1  8 inches or less and made them totally useless to our sweat ceremonies." (Doc. # 4 at 3.) He
2  contends that they are now "too short to lift and set hot rocks inside our lodge" and that "[h]eated
3  stones are a central part of our ceremonies." (*Id*.) He claims there was no legitimate penological
4  interest in disturbing the antlers. (*Id*. at 4.)

5      Defendant Olivas has filed a motion for summary judgment arguing there is no evidence
6  she burdened a sincerely held religious belief without a justification reasonably related to
7  legitimate penological interests. (Doc. # 20 at 2.) She contends that Native Americans were
8  allowed to retain two deer antlers or one pair of deer antlers, and they were blunted in
9  accordance with the AR and for the valid penological purpose of protecting the safety and
10  security of the institution (albeit mistakenly to eight inches instead of the eighteen inches
11  provided by the AR). (*Id*.) She also contends she is entitled to qualified immunity. (*Id*. 10-11.)

12  ## II. LEGAL STANDARD

13  "The purpose of summary judgment is to avoid unnecessary trials when there is no
14  dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18
15  F.3d 1468, 1471 (9th Cir. 1994) (citation omitted). In considering a motion for summary
16  judgment, all reasonable inferences are drawn in favor of the non-moving party. *In re Slatkin*,
17  525 F.3d 805, 810 (9th Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255
18  (1986)). "The court shall grant summary judgment if the movant shows that there is no genuine
19  dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.
20  Civ. P. 56(a). On the other hand, where reasonable minds could differ on the material facts at
21  issue, summary judgment is not appropriate. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,
22  250 (1986).

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1)(A), (B).

If a party relies on an affidavit or declaration to support or oppose a motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

In evaluating whether or not summary judgment is appropriate, three steps are necessary: (1) determining whether a fact is material; (2) determining whether there is a genuine dispute as to a material fact; and (3) considering the evidence in light of the appropriate standard of proof. *See Anderson*, 477 U.S. at 248-250. As to materiality, only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment; factual disputes which are irrelevant or unnecessary will not be considered. *Id*. at 248.

In deciding a motion for summary judgment, the court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.'...In such a case, the moving party has the initial burden of establishing the absence of a genuine [dispute] of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp. v. Cartrett*, 477 U.S. 317, 323-25 (1986).

If the moving party satisfies its initial burden, the burden shifts to the opposing party to establish that a genuine dispute exists as to a material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a genuine dispute of material fact, the opposing party need not establish a genuine dispute of material fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (quotation marks and

citation omitted). The nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *Id*. Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine dispute of material fact for trial. *Celotex*, 477 U.S. at 324.

> That being said,
> [i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it; or (4) issue any other appropriate order.

Fed. R. Civ. P. 56(e).

At summary judgment, the court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine dispute of material fact for trial. *See Anderson*, 477 U.S. at 249. While the evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in its favor," if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *Id*. at 249-50 (citations omitted).

### III. DISCUSSION

**A. First Amendment Free Exercise of Religion**

"The First Amendment, applicable to state action by incorporation through the Fourteenth Amendment...prohibits government from making a law prohibiting the free exercise [of religion]." *Hartmann v. Cal. Dep't of Corr. & Rehab.*, 707 F.3d 1114, 1122 (9th Cir. 2013) (citations and quotation marks omitted, alteration original). "The right to exercise religious practices and beliefs does not terminate at the prison door. The free exercise right, however, is necessarily limited by the fact of incarceration, and may be curtailed in order to achieve legitimate correctional goals or to maintain prison security." *McElyea v. Babbitt*, 833 F.2d 196, 197 (9th Cir. 1987) (per curiam); *see also O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987); *Cruz v. Beto*, 405 U.S. 319, 322 (1972); *Hartmann*, 707 F.3d at 1122; *Shakur v. Schriro*, 514 F.3d 878, 883-84 (9th Cir. 2008). To implicate the free exercise clause, a prisoner must

establish his belief is both sincerely held and rooted in religious belief. *See Shakur*, 514 F.3d at 884-85.

In analyzing the legitimacy of regulation of a prisoners' religious expression, the court is instructed to utilize the factors set forth in *Turner v. Safley,* 482 U.S. 78 (1987). *See O'Lone*, 482 U.S. at 349; *Shakur*, 514 F.3d at 884. The *Turner* factors are: (1) "there must be a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) "whether there are alternative means of exercising the right that remain open to prison inmates"; (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; (4) the "absence of ready alternatives" and "the existence of obvious, easy alternatives." *Turner*, 482 U.S. at 89-91.

**B. Analysis**

According to defendant Olivas, on or about July 26, 2012, she was on the Native American religious grounds at LCC with the chaplain, and observed approximately eight pairs of deer antlers on the grounds. (Doc. # 20-2 at 2 ¶¶ 3-4 (Olivas' Decl.).) She sent for Plaintiff to come to the grounds and asked him to pick the best pair to leave on the grounds. (*Id*. ¶ 5.) Plaintiff chose a pair of antlers that were not blunted. (*Id*.) As to the excess antlers, the Native Americans elected to burn them. (*Id*. ¶ 6.) For safety and security reasons, and pursuant to Administrative Regulation (AR) 810.2, she removed the remaining pairs of antlers, marked the pair to be modified and sent that pair to maintenance. (*Id*. ¶ 7; *see* AR 810, Doc. # 20-3 at 2; Doc. # 20-4 (authenticating declaration for AR 810).) In error, she asked that the antlers be blunted to eight inches, because she believed that the AR governing these items directed that the antlers be no longer than eight inches long; however, the AR actually allows deer antlers to maintain a maximum length of eighteen inches long. (*Id*. ¶ 8.) Pursuant to her instruction, maintenance workers blunted the antlers (to eight inches) and returned them approximately four days later. (*Id*. at 3 ¶ 9.) During this time, one of the antlers was dropped, causing one of the blunted prongs to break off. (*Id*. ¶ 10.) It was Olivas' understanding that Warden LeGrand and the chaplain made efforts to procure replacement antlers of the proper eighteen inch length and

1 the Native American practitioners at LCC now have two pairs of such antlers for religious
2 purposes. (*Id*.)  She maintains she harbored no malicious intent in connection with her
3 involvement of the blunting of the antlers and she did not intend to desecrate or otherwise
4 destroy Native American religious items. (*Id*. ¶ 11.)

5 After the excess deer antlers were confiscated, on August 1, 2012, Plaintiff grieved the
6 matter to the Warden, Robert LeGrand, stating in his informal level grievance that Olivas
7 removed religious materials from their religious group items with "malicious intent to desecrate
8 and destroy" the deer antlers. (Doc. # 20-1 at 2 ¶ 3.) Warden LeGrand responded to Plaintiff by
9 citing AR 810.2, which allows a total of two deer antlers, and informed Plaintiff that the amount
10 of antlers on the Native American religious grounds exceeded the permitted amount and were
11 considered contraband, and the excess were burned by the Native American practitioners. (*Id*. ¶
12 4.) Plaintiff filed a first level grievance to which Warden LeGrand responded. (*Id*. ¶ 5.)

13 Warden LeGrand spoke to Olivas and learned there were eight or nine pairs of antlers
14 being kept on the Native American religious grounds, well in excess of the amount permitted by
15 the AR. (*Id*. ¶ 6.) In addition, he learned that the pair of antlers that was being kept needed to be
16 blunted, so as not to present safety or security concerns. (*Id*. at 3 ¶ 7.) Warden LeGrand
17 acknowledges that Olivas misread the AR which resulted in the antlers being blunted to eight
18 inches. (*Id*. ¶ 8.) Warden LeGrand informed Plaintiff that he would work to rectify the situation
19 and obtain replacement antlers as soon as they became available, and that the misreading of the
20 AR was not done with any malice. (*Id*.) Warden LeGrand further advised Plaintiff that the antlers
21 were dropped accidentally and there was no malice in the actions or intent to desecrate or destroy
22 Native American religious items. (*Id*. ¶ 10.)

23 On December 18, 2012, Warden LeGrand was informed by the chaplain that a volunteer
24 offered to donate a new set of antlers to the Native American religious practitioners at LCC, and
25 he approved this donation. (*Id*. ¶ 12.)

26 Plaintiff claims that when Olivas came to the Native American grounds, she was not with
27 the chaplain but with another correctional officer (Doc. # 22 at 4); however, this fact is not
28 material to Plaintiff's claim.

Plaintiff also claims there were not eight pairs of antlers on the grounds, but six antlers or three pairs. (Doc. # 22 at 4.) This is also not material to Plaintiff's claim, because regardless of whether there were eight pairs or three pairs, there amount present were in excess of those allowed by the AR.

Next, Plaintiff disputes that Olivas told Plaintiff to select the best pair, but that this information was relayed by another officer. (Doc. # 22 at 4.) Who told Plaintiff to select a pair of alters to keep is also immaterial to Plaintiff's claim.

Plaintiff claims that Olivas' motion should not be granted because the new antlers provided to the Native Americans were from an outside sponsor and it was Plaintiff who negotiated with the sponsor to obtain the antlers. (Doc. # 22 at 5.)

Plaintiff's opposition also references an NDOC code of ethics for employees and regulation concerning nepotism, neither of which have any impact on his civil rights claim. (*See* Doc. # 22 at 8-9.

**1. First *Turner* Factor**

The "regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational." *Turner*, 482 U.S. at 89-90. Additionally, "the governmental objective must be a legitimate and neutral one." *Id*. at 90 (citation omitted). With respect to the connection between the regulation of religious exercise and the legitimate penological interest, evidence concerning anticipated problems, even though no actual problems have arisen from the prisoner's conduct, is sufficient to meet this standard. *See Friedman v. Arizona*, 912 F.2d 328, 332-33 (9th Cir. 1990).

Here, AR 810.2 lists the allowable group religious items for religious groups, including Native Americans. (Doc. # 20-3 at 2.) It permits, among other things, Native Americans as a group to keep two deer antlers at a maximum of eighteen inches long. (*Id*.) This is for safety and security reasons. (Doc. # 23-1 at 2 ¶¶ 4-7.) Deer antlers could be used as a weapon, and allowing inmates to have multiple sets of antlers at a length of more than eighteen inches would pose a danger to the institution. (*Id*.)

When defendant Olivas observed an amount of deer antlers on the Native American

grounds that exceeded those allowed by the AR, the inmates were allowed to keep one pair consistent with the regulation, and the chosen non-blundted pair was then taken to be blunted to eliminate safety and security concerns. It was at this time that Olivas mistakenly instructed that they be blunted down to eight inches, instead of the eighteen inches provided by the AR. It was also at this time that the pair was dropped, and damaged.

The regulation limiting Native Americans to possession of a pair of antlers, blunted and eighteen inches in length is reasonably related to the goal of institutional safety and security. It is obvious that a non-blunted pair of deer antlers poses a safety and security risk. The length restriction of eighteen inches also appears reasonably related to safety and security concerns of the items being used as weapons. There is no evidence indicating that the direction to blunt the antlers was intentional or that the damage subsequently done when the antlers were dropped was done on purpose.[2] Therefore, Olivas has met her burden under the first *Turner* factor.

**2. Second *Turner* Factor**

Where 'other avenues' remain available for the exercise of the asserted right...courts should be particular conscious of the 'measure of judicial deference owed to corrections officials...in gauging the validity of the regulation.'" *Turner*, 482 U.S. at 90 (citation omitted).

Under the second *Turner* factor, "[t]he relevant inquiry...is not whether the inmate has an alternative means of engaging in the particular religious practice that he or she claims is being affected; rather, [the court must] determine whether the inmates have been denied all means of religious expression." *Ward v. Walsh*, 1 F.3d 873, 876 (9th Cir. 1993). Also relevant is "the distinction between a religious practice which is a positive expression of belief and a religious commandment which the believer may not violate at peril of his [or her] soul." *Ward*, 1 F.3d at 878 (concluding where prison officials have deprived Orthodox Jewish prisoner of kosher diet, rabbi, and religious services, the second factor weighed in the prisoner's favor); *compare*

---

[2] In a separately filed request for judicial notice (Doc. # 24), Plaintiff represents that he can prove that the action was malicious through testimony of the chaplain; however, he does not provide such testimony in connection with that filing or in his opposition to defendant Olivas' motion for summary judgment. Therefore, he has not met his burden of establishing a genuine dispute of material fact. His representation that he *will* be able to prove something is insufficient. Instead, he was required to provide such evidence in opposing defendant's motion. The court has issued a separate order denying Plaintiff's request for judicial notice.

*Henderson v. Terhune*, 379 F.3d 709, 714 (9th Cir. 2004) (finding that where a prisoner, by cutting his hair, would be considered 'defiled' and therefore unworthy or unable to participate in the other major practices of his religion, the prisoner would be 'denied all means of religious expression').

With respect to this factor, Olivas argues that the AR provides Native Americans many other means of exercising their religion, including many other group and personal religious items, and the use of one pair of deer antlers as a group that are blunted and do not exceed eighteen inches in length. (*See* Doc. # 20-3 at 2.) The court agrees that Plaintiff has many avenues of exercising his religion and was not denied all means of religious expression. Therefore, this factor weighs in favor of defendant Olivas.

**3. Third and Fourth *Turner* Factors**

Under the third *Turner* factor, "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally," the court may consider security concerns. *See McCabe*, 827 F.3d at 637.

Under the fourth factor, "the absence of ready alternatives is evidence of the reasonableness of a prison regulation" while "the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns." *Turner*, 482 U.S. at 90. With respect to the fourth *Turner* factor, prison officials do not bear the burden of disproving the availability of alternatives. *See O'Lone*, 482 U.S. at 350.

In this case, it is not clear Plaintiff is seeking some sort of "accommodation" per se, because the gravamen of his complaint is the allegation that defendant Olivas took the antlers and instructed that they be blunted to eight inches (when the regulation states that they may be up to eighteen inches in length) and then dropped them with the malicious intention of desecrating religious property of Native Americans. He concedes that an outside donor supplied compliant antlers several months later, and does not seem to take issue with NDOC's regulation on the number of antlers and length. He asserts that defendant Olivas intended to desecrate the Native Americans' sacred artifact; however, there is simply no factual support, other than Plaintiff's mere conjecture, that the antlers at issue here were blunted too short or dropped on

1 purpose, in an effort to stifle Plaintiff's ability to exercise his religious beliefs. Furthermore, there
2 is no evidence that the regulation or defendant Olivas' implementation of it was an exaggerated
3 response or was otherwise intended to burden Plaintiff's ability to freely exercise his religion.
4 Rather, the implementation of AR 810 in this instance was aimed at achieving legitimate
5 correctional goals of maintaining prison security. As such, defendant Olivas' motion for
6 summary judgment should be granted.

**C. Qualified Immunity**

"Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 131 S.Ct. 2074, 2080 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)); *see also Chappell v. Mandeville*, 706 F.3d 1052, 1056 (9th Cir. 2013) (citation omitted) ("Qualified immunity protects government officials from civil damages 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.");Padilla v. Yoo*, 678 F.3d 748, 758 (9th Cir. 2012); *Pearson v. Callahan*, 555 U.S. 223 (2009).

"Whether qualified immunity applies thus 'turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken.'" *Chappell*, 706 F.3d at 1056 (quoting *Messerschmidt v. Millender*, 132 S.Ct. 1235, 1245 (2012)). In other words, a "[g]overnment official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *al-Kidd*, 131 S.Ct. at 2083 (alterations in original) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)); *see also Padilla,* 678 F.3d at 758 (citation omitted).

"[A] case directly on point [is not required], but existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 131 S.Ct. at 2083. "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions," and courts are "not to define clearly established law at a high level

of generality[.]" *Id*. at 2084-85; *see also Dunn v. Castro*, 621 F.3d 1196, 1201 (9th Cir. 2010) ("[T]he right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established.").

The court has determined that defendant Olivas did not violate Plaintiff's First Amendment rights under the Free Exercise Clause; therefore, need not proceed with a qualified immunity analysis. That being said, defendant Olivas would also be entitled to qualified immunity because a reasonable correctional officer in her position could not have known that mistakenly directing the antlers to be blunted to eight inches instead of the allowable eighteen inches and mistakenly dropping the antlers would violate an inmate's First Amendment rights under the Free Exercise Clause.

## IV. RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that the District Judge enter an Order **GRANTING** defendant Olivas' Motion for Summary Judgment (Doc. # 20) and entering judgment in favor of defendant Olivas and against Plaintiff.

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to this Report and Recommendation within fourteen days of receipt. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the district judge.

2. That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment by the district court.

DATED: June 17, 2014.

_____
WILLIAM G. COBB
UNITED STATES MAGISTRATE JUDGE